UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DARIN CONTINI, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil No. 20-11727-LTS |
| | ) |
| FEDERAL RESERVE BANK OF | ) |
| BOSTON, | ) |
| | ) |
| Defendant. | ) |
| | ) |

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 31)

July 22, 2022

SOROKIN, J.

On September 21, 2020, Darin Contini sued the Federal Reserve Bank of Boston ("Federal Reserve") alleging discrimination and retaliation in violation of federal law.[1]  Pending before the Court now is the Federal Reserve's Motion for Summary Judgment, in which it challenges Contini's ability to succeed at trial on all five claims he brings against it.  Doc. No. 31.[2]  Contini has opposed.  Doc. No. 36.  The Court has carefully reviewed the parties' submissions and arguments and applied the familiar summary judgment standard, drawing all reasonable inferences and resolving genuine disputes of material fact in Contini's favor as the

---

[1] The Complaint includes five claims: (1) disability discrimination in violation of the Americans with Disabilities Act ("ADA"); (2) failure to accommodate, presumably also in violation of the ADA; (3) retaliation in violation of the ADA; (4) interference with rights in violation of the Family and Medical Leave Act ("FMLA"); and (5) retaliation in violation of the FMLA.  Doc. No. 1.

[2] Citations to "Doc. No. __" reference documents appearing on the court's electronic docketing system; pincites are to the page numbers in the ECF header.

non-moving party.  For the reasons that follow, the Court ALLOWS IN PART and DENIES IN PART the Federal Reserve's Motion for Summary Judgment (Doc. No. 31).

I.      BACKGROUND[3]

In 2001, the Federal Reserve hired Contini as an intern.  Doc. No. 37-1 ¶ 2.  Throughout his tenure at the Federal Reserve, Contini held various positions and eventually became a manager from 2012 until his termination.[4]  Id. ¶¶ 1, 7.  At the Federal Reserve, Contini worked within the Supervision, Regulation, & Credit Department ("SRC") and led the Statistics Unit.  Id. ¶¶ 3, 101.

A.      FMLA Leave

In the months preceding June 2018, Contini began to experience significant mental health episodes.  Doc. No. 37-2 ¶¶ 6-7.  He eventually felt like he could not work anymore and requested FMLA leave which the Federal Reserve approved.  Id. ¶¶ 8, 10.  Contini took a leave of absence from on or around June 12, 2018 until January 3, 2019 when he returned to work. Doc. No. 37-1 ¶ 25.  While on FMLA leave, Contini experienced several changes in his personal life. First, he describes that he was diagnosed with major depressive episode, post-traumatic stress disorder, severe anxiety, and bipolar disorder and received therapy from David Medeiros, LICSW.  Id. ¶ 27; Doc. No. 37-2 ¶ 9.  His therapist was based in Providence, Rhode Island, and Contini preferred in-person meetings as they were more helpful to him.  Doc. No. 37-1 ¶ 191. Second, just weeks before his return to work on January 3, 2019, he moved from Boston to

---

[3] Unless specifically noted, these facts are undisputed.  "Where material disputes remain, they are highlighted in the court's legal analysis and viewed in the light most favorable to the nonmoving party."  Davis v. Murphy, No. 13-CV-11900-IT, 2018 WL 1524532, at *1 (D. Mass. Mar. 28, 2018).
[4] Contini agrees that he was a "manager" but argues that he no longer had managerial job responsibilities starting in January 2019.  Doc. No. 37-1 ¶ 7.

Provincetown, Massachusetts for financial reasons due to his then pending divorce.  Id. ¶ 32.
Provincetown is approximately 110 miles away from Boston.  Id. ¶ 33.

While Contini experienced changes in his personal life during his FMLA leave, the
Federal Reserve also implemented various changes in the workplace.  First, Contini's supervisors
relocated him to a private office after offering him the new office in December 2018 to which
Contini responded that he was "cool with it."  Id. ¶¶ 55-56.  Prior to receiving this private office,
Contini shared an office with his supervisors Jack Wozek and Maureen Savage, and he also had
another office space which he used to meet with his staff.  Id.  In receiving the new office,
Contini describes that he lost the latter space once he returned, id. ¶ 57, though Contini has not
submitted evidence showing he lacked access to a space in which to meet his staff when
necessary.  Second, the Federal Reserve gave several employees within the SRC, including other
managers, new titles as part of a review it conducted in 2017 of its organizational structure.  Id.
¶¶ 58-60.  This led to Contini's title changing from "Manager, Statistics" to "Business Manager
2."[5]  Id.  Third, the Federal Reserve increased Contini's base salary on January 1, 2019 from
$169,319 to $172,705.[6]  Id. ¶ 45.

B.  Return to Work and Requests for Accommodation

Contini returned to work on January 3, 2019.  Doc. No. 37-2 ¶ 25.  A few weeks before
his return, Contini chose to move from Boston, where he had resided for several years, to
Provincetown, thus requiring him to endure a roundtrip driving commute amounting to as much
as seven hours.  See Doc. No. 37-1 ¶ 33.  Due to his move, Contini asked Christina Knight, the

---

[5] The parties dispute whether this was a demotion, with Contini arguing that his prior job duties
and supervisory responsibilities were removed and the Federal Reserve arguing that it was a
mere title change and that his salary increased.  Id. ¶¶ 61-63.
[6] Contini contends that although his base salary increased, his overall salary range and
compensation decreased.  Id. ¶ 61.

Federal Reserve's nurse, whether he could work four ten-hour days instead of working five days because of the stress of his commute from Provincetown to Boston.  Doc. No. 33 at 52, 63 (Exhibit A).  He also asked Human Resources about working from home because of the stress and anxiety of getting to work.  Id. at 64.  Once he returned to work, he informed Wozek, Savage, and Steven Gendron, who later became Contini's supervisor, that he had bipolar and post-traumatic stress disorders and was receiving treatment.  Doc. No. 37-2 ¶ 47.  In February 2019, he asked Wozek and Savage if he could work from home because of the stress and anxiety of his commute and so he could see a therapist.  Doc. No. 37-1 ¶¶ 189-90; Doc. No. 37-2 ¶ 51.  All of these individuals denied Contini's requests, and Contini informed Knight that the denial made it impossible for him to see his therapist and get treatment.  Doc. No. 33 at 163-64 (Exhibit L); Doc. No. 37-2 ¶ 53.

To facilitate his transition and apprise him of the changes that had occurred during his absence, Contini's supervisors provided him with a document containing tasks they expected him to complete upon his return revolving around trainings, emails, reports, and the like.  Doc. No. 37-1 ¶¶ 41-43; Doc. No. 33-1 at 41-44.  The Federal Reserve identifies this document as a "Re-Entry Plan."[7]  Doc. No. 37-1 ¶ 41.  This plan provided for a "gradual resumption of managerial staff oversight responsibilities" and specified that "resumption of non-core, non-local business activities is anticipated after the completion of priorities outlined in this document."  Doc. No. 33-1 at 41 (Exhibit U).

---

[7] The Federal Reserve's use of "Re-Entry Plan" to describe the document is not determinative of whether the document was in fact intended to help Contini return to his position.  The Court engages in that analysis later in discussing the interference with FMLA rights claim (Count IV).

C.  Contini's Performance

For Contini's 2017 performance review, Wozek gave him a rating of 3 out of a possible

5, or a "Successful Performance."  Doc. No. 37-1 ¶ 17; Doc. No. 33 at 129 (Exhibit F).  He

received the same rating for his 2018 performance review.  Doc. No. 33 at 133-36 (Exhibit G).

In June 2018 prior to Contini's leave, however, the SRC conducted a work environment survey,

and the results showed that several individuals in Contini's unit were unhappy, in part because

they believed Contini exhibited "favoritism" by "favoring certain individuals who end up gaining

more access to him and promotions."  Doc. No. 37-1 ¶¶ 100-02.  The results also found that 77%

of those surveyed in Contini's unit disagreed or strongly disagreed with the statement that they

are "empowered and encouraged to innovate," 54% disagreed that their "ideas are valued," and

38% disagreed that they "feel comfortable speaking up/sharing an opposing viewpoint."  Id.

When Contini returned from his FMLA leave in January 2019, his supervisors asked him to

develop an approach for responding to the survey results.  Id. ¶ 107.  In March 2019, his

supervisors authored a "Re-Entry Update" in which they noted their disapproval that Contini had

not produced a written summary about his plan to respond to the survey results.  Id. ¶¶ 111-12.

Contini disputes that his supervisors asked for a written summary and references the Re-Entry

Plan which states "none" regarding the deliverables needed for the work environment survey.  Id.

¶ 108.

On March 8, 2019, Contini experienced a loss of consciousness and woke up on the floor

of his office around midnight.  Id. ¶ 89.  Several individuals reported to Savage that they had

observed him sleeping in his office on more than one occasion, including on March 8, 2019

itself.  Id. ¶¶ 92-95.  On April 24, 2019, Contini received his 2019 mid-year performance

evaluation which referenced the various times Contini was found asleep at his desk among other

performance issues.  Id. ¶ 113; Doc. No. 33 at 143-49 (Exhibit I).  His supervisors also issued

him an Initial Warning around the same time because of (1) untimely work product, (2)

incomplete communications, and (3) the lack of initiative in developing and implementing a plan

to respond to the work environment survey.  Doc. No. 37-1 ¶¶ 20-21, 114; Doc. No. 33 at 151

(Exhibit J).

On May 24, 2019, Contini provided his supervisors with a written plan on responding to

the survey results.  Doc. No. 37-1 ¶ 116.  After exchanging several drafts of the plan, Contini

submitted a revised draft on July 1, 2019, and Wozek responded with feedback regarding

deficiencies with his plan.  Id. ¶¶ 117-18.  The next day on July 2, 2019, his supervisors issued a

Final Warning because they believed that Contini still had not completed a plan to respond to the

survey results.  Id. ¶ 119; Doc. No. 33 at 156 (Exhibit K).  This Final Warning also reflected that

Contini had multiple absences; specifically, he took thirty-one days off during the seven months

he worked after his return to the Federal Reserve.  Doc. No. 37-1 ¶¶ 182, 193.

On July 24, 2019, an officer within the Federal Reserve's law enforcement unit reported

that she observed Contini exhibiting unusual behavior on work premises and expressed concerns

about potential drug or alcohol usage.  Id. ¶ 198.  The Federal Reserve arranged for Contini to

take a drug test on July 25, 2019.  Id. ¶ 201.  The test returned negative.  Id. ¶ 203.  A few days

later on July 30, 2019, his supervisors held a meeting with him during which Contini describes

that he stated his intentions to speak to his lawyer.  Id. ¶¶ 204, 206.  Two days later on August 1,

2019, the Federal Reserve mailed Contini his termination letter after deciding that he would be

unlikely to complete all of the Final Warning's requirements by its expiration on September 3,

2019.  Id. ¶¶ 213-21.  Contini disputes the aforementioned characterization of his work

performance.

II.   LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once a party "has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.'" Barbour v. Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir. 1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). The Court is "obliged to [] view the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor." LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993). Even so, the Court is to ignore "conclusory allegations, improbable inferences, and unsupported speculation." Prescott v. Higgins, 538 F.3d 32, 39 (1st Cir. 2008) (quoting Medina–Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)). A court may enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

III.   DISCUSSION

A.  Discrimination

Contini's Complaint (Doc. No. 1) presents two theories of disability discrimination under the ADA: (1) disparate treatment[8] and (2) failure to accommodate. The Court assesses each theory of liability in turn.

---

[8] Although Contini does not expressly use the words "disparate treatment" in describing Count I, his description of the claim leads the Court to reasonably conclude that the claim is one of disparate treatment. See Doc. No. 1 at 7-8.

1. *Disparate Treatment (Count I)*

Contini argues in Count I that the Federal Reserve took adverse employment actions against him because of his disability.  Doc. No. 1 at 7-8.  Under the disparate treatment theory of liability pursuant to the ADA, Contini must establish the following elements: "(1) that []he is disabled under the ADA;[9] (2) that he is 'qualified to perform the essential functions of his job with or without reasonable accommodation;'" and (3) "that []he 'was discharged or otherwise adversely affected in whole or in part because of [his] disability.'"  Echevarria v. AstraZeneca Pharm. LP, 856 F.3d 119, 126 (1st Cir. 2017) (quoting Jones v. Nationwide Life Ins. Co., 696 F.3d 78, 87 (1st Cir. 2012)).  Once a plaintiff meets their burden of establishing this prima facie case, the "burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action." Flaherty v. Entergy Nuclear Operations, Inc., 946 F.3d 41, 54 (1st Cir. 2019) (citing Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 33-34 (1st Cir. 2001)).  "If the employer articulates such a reason, the burden shifts back to the plaintiff, who must then show, by a preponderance of the evidence, that the employer's proffered reason for the adverse employment action was pretextual and that the true reason was unlawful discrimination."  Id.

In this case, Contini argues that the Federal Reserve concedes the discrimination prima facie case with respect to termination,[10] Doc. No. 37 at 8, and the Federal Reserve does not refute this statement.  See generally Doc. No. 38.  Moreover, both parties focus their arguments

---

[9] The Federal Reserve does not expressly dispute the first element that Contini was disabled but contends instead that he did not communicate that he remained disabled upon his return from FMLA leave.  See, e.g., Doc. No. 32 at 3 n.3.  Similarly, the Federal Reserve does not engage in an analysis of the second element of whether Contini was "qualified."  See generally Doc. No. 32.  Accordingly, the Court focuses its analysis on the third element of an adverse employment action.

[10] In his Opposition, Contini only focuses on the adverse action of termination while addressing his discrimination claim.  See Doc. No. 37 at 8.  Accordingly, the Court conducts its analysis of Count I only on the termination action as well.

on the pretext analysis as to the discrimination claim, so the Court follows suit.  See, e.g., Doc. No. 32 at 16; Doc. No. 37 at 8.  "[I]n assessing pretext, a court's focus must be on the perception of the decisionmaker, that is, whether the employer believed its stated reason to be credible." Velez v. Thermo King de Puerto Rico, Inc., 585 F.3d 441, 452 (1st Cir. 2009) (quoting Azimi v. Jordan's Meats, Inc., 456 F.3d 228, 246 (1st Cir. 2006)).  "[I]t is not enough for a plaintiff merely to impugn the veracity of the employer's justification; he must elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real [and unlawful] motive of discrimination."  Id.  That said, "where a plaintiff in a discrimination case makes out a prima facie case and the issue becomes whether the employer's stated nondiscriminatory reason is a pretext for discrimination, courts must be 'particularly cautious' about granting the employer's motion for summary judgment."  Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 167 (1st Cir. 1998) (quoting Stepanischen v. Merchants Despatch Transp. Corp., 722 F.2d 922, 928 (1st Cir. 1983)).

Contini provides several theories of pretext which can be grouped into the following categories: (1) denying him use of the Federal Reserve's flexible work policy; (2) deviating from established policy or practices; and (3) negatively evaluating his performance.  See, e.g., Doc. No. 37 at 8-17.  The Court addresses each in turn.

First, as to the flexible work policy, Contini argues that he requested to work from home one day a week pursuant to the flexible work policy and was denied even though "other employees under Wozek and Savage regularly worked from home per that policy."  Id. at 9.  The Federal Reserve responds that its policy provides expressly that "business needs" can prevent certain employees from using the policy, and Contini's supervisors concluded that his presence after a seven-month FMLA leave was important so he could reorient himself.  Doc. No. 38 at 2.

Insofar as Contini alleges a failure to accommodate, the Court addresses that in its analysis of Count II below.  Insofar as Contini argues that denying him use of the policy shows pretext for unlawful discrimination, the Court disagrees.  No reasonable jury could conclude that wanting Contini to be in the office five days a week after coming back from a seven-month leave during which several organizational changes occurred to help him transition back to work was pretext for unlawful disability discrimination without more.[11]  There is no more at that time. Additionally, there was evidence of discontent with Contini's management style within his unit prior to his leave as shown through the work environment survey results.  See Doc. No. 37-1 ¶ 101.  Common sense suggests, and the facts as of his return do not support another reasonable alternative, that the Federal Reserve wanted Contini in the office given the length of his leave, the organizational changes implemented during his absence, and the negative reviews of his management rendered before he left, but not yet addressed.  And although other employees were allowed to use the policy, Contini has not alleged that they were similarly situated to him.  See Velez, 585 F.3d at 451 (describing that "to be probative of discriminatory animus, a claim of disparate treatment must rest on proof that the proposed analogue is similarly situated in material respects." (internal quotation marks and citations omitted)).  Accordingly, a reasonable jury could not conclude that this was evidence of pretext.

　　　Next, Contini argues that the Federal Reserve (1) deviated from established policy and practices and (2) negatively evaluated his performance both of which were pretexts for unlawful disability discrimination.  As to the former, Contini describes several instances where the Federal Reserve allegedly subjected him to requirements that it did not impose on himself previously or

---

[11] The Court also notes that the underlying events occurred in 2019 before the COVID-19 pandemic began which arguably made working from home more widely acceptable.

others, such as the monitoring his timeliness and location.  Doc. No. 37 at 11.  The Federal

Reserve responds that it began requiring that he appear online by 9:00 a.m. each morning in

April 2019, nearly four months after he returned to work.  Doc. No. 38 at 4.  And, the Federal

Reserve imposed these changes on the heels of (1) tardiness and absences, (2) falling asleep in

his office in at least one undisputed instance, and (3) the undisputed evidence that the Federal

Reserve received reports of other instances of Contini falling asleep at his desk.[12]  See, e.g., Doc.

No. 32 at 10; Doc. No. 37-1 ¶ 89.  A reasonable jury could not conclude that the Federal Reserve

monitoring his time and location evidence of pretext.[13]

As to the negative performance evaluations, Contini argues that his performance history

"was good to excellent right up to the time that he took FMLA leave to treat his mental health"

and that after he returned, his projects were evaluated poorly, and his supervisors rated him

negatively.  Doc. No. 37 at 12.  The assertions of an unblemished positive record, however, are

overstated given the survey results that demonstrate negative feedback on Contini's management

---

[12] Contini contends this evidence is disputed.  Not so.  The focus of the present summary
judgment inquiry is the Federal Reserve's state of mind (or Contini's supervisors acting on
behalf of the Federal Reserve), i.e., the reason(s) it did what it did.  The Federal Reserve submits
admissible evidence that after Contini woke up at midnight in his office (an undisputed event of
which the Federal Reserve learned at the time from Contini at least), several other employees
reported seeing Contini asleep at his desk on other occasions to the Federal Reserve.  See, e.g.,
Doc. No. 37-1 ¶¶ 92-95.  No evidence submitted by Contini disputes the existence of these
reports.  He only states that there are no documents directly from those team members stating
their observations.  Id. ¶¶ 94-95.  That, however, does not dispute the Federal Reserve's state of
mind in believing that Contini had fallen asleep at his desk on more than one occasion.  Thus,
that the Federal Reserve received these reports is undisputed.  That Contini now says under oath
he only ever fell asleep once at his desk does not dispute the receipt of the reports or change the
mix of information then known to the Federal Reserve.  Finally, Contini has not attempted to
establish that the reports themselves from the other employees were motivated by discriminatory
animus.
[13] The Court adds that it has serious doubts that monitoring whether an employee required to
work from the office is in the office during office hours (when the employee is also required to
work during typical office hours) is a materially adverse employment action.

style within his unit prior to his FMLA leave.  That said, Contini describes that his negative performance evaluations were unwarranted and based on his performance on unnecessary tasks that deviated from prior practices, but that he completed them timely and satisfactorily in any event.  Id. at 11-12.  The Federal Reserve disputes this characterization, arguing that "criticisms of Contini's performance were based on objective criteria, such as his inability to meet pre-established deadlines and his inability (or unwillingness) to complete assignments requested of him."  Doc. No. 38 at 3-4 (emphasis in original).  Contini disputes both that he was untimely and that the deadlines were enforced as contended by the Federal Reserve.  Finally, Contini points out that the Federal Reserve terminated Contini thirty-five days before the expiration of the Final Warning deadline which was intended to provide him time to improve.  Doc. No. 37 at 14.

In the end whether the Federal Reserve terminated Contini for poor performance as it asserts or whether this reason was pretext for disability discrimination presents a genuine dispute of material fact.  Drawing all inferences in Contini's favor as well as resolving all disputed issues of fact in his favor, a reasonable jury could find for Contini on this issue if the jury, among other conclusions, credits Contini's evaluation of the work product he produced, concludes that the stated characterization of it by his supervisors was pretextual or marred by disability discrimination, finds that Contini met the ultimate deadlines, and determines that the earlier deadlines were neither previously enforced nor material to the Federal Reserve.  That said, there is substantial contrary evidence and law: Courts (and juries) do not sit as "super personnel departments."  Lahens v. AT&T Mobility Puerto Rico, Inc., 28 F.4th 325, 336 (1st Cir. 2022).  In other words, managers are entitled to make their own judgments about the performance of their employees provided such evaluations are not tainted by prohibited factors, here Contini's disability.  Of course, it is precisely the Federal Reserve's contention that Contini simply did not

perform in their judgment.  Some of the contrary evidence here includes the negative survey results from employees within his unit, multiple reports the Federal Reserve received of Contini sleeping in his office, and Contini's own concession that he awoke in his office at midnight on one occasion.  Doc. No. 37-1 ¶¶ 92-95.  Contini also agrees that he was late to work on at least one occasion because he fell asleep overnight in a local Marshall's parking lot instead of going home and was also absent for periods of time, leading him to miss part of a meeting.  Id. ¶¶ 180-81.  Given the disputed issues of material fact and drawing all reasonable inferences in Contini's favor at this stage, however, the Court DENIES the Federal Reserve's Motion for Summary Judgment (Doc. No. 31) as to Count I.

2.  <em>Failure to Accommodate (Count II)</em>

Contini argues in Count II that the Federal Reserve failed to accommodate his disability by modifying his work schedule.  Doc. No. 1 at 8.  To make out this claim, Contini must establish the first two elements of the disparate treatment claim described above along with the third element that "the employer knew of [his] disability, yet failed to reasonably accommodate it."  Audette v. Town of Plymouth, 858 F.3d 13, 20 (1st Cir. 2017) (quoting Lang v. Wal-Mart Stores E., L.P., 813 F.3d 447, 454 (1st Cir. 2016)).  The plaintiff, however, bears "the burden of showing that she sufficiently requested the accommodation in question," Freadman v. Metro. Prop. & Cas. Ins. Co., 484 F.3d 91, 102 (1st Cir. 2007) (internal quotation marks omitted), because "the ADA's reasonable accommodation requirement usually does not apply unless 'triggered by a request' from the employee."  Reed v. LePage Bakeries, Inc., 244 F.3d 254, 260-61 (1st Cir. 2001) (quoting Henry Perrett, Jr., 1 Americans With Disabilities Act Handbook, § 4.17, at 121 (3d ed. 1997)).

Assuming arguendo that Contini made a sufficient request for accommodation, Contini must then show that the proposed accommodation is reasonable, i.e., that he "could perform the job's essential functions."  Audette, 858 F.3d at 20.  Here, Contini requested an accommodation of working from home one day a week so he could see his therapist.  See, e.g., Doc. No. 37-2 ¶¶ 50-53; Doc. No. 33 at 163.  Contini bears the burden to show how his requested accommodation of working one day from home would have allowed him to perform his job's essential functions, or that he could do so even without a reasonable accommodation.  Lang, 813 F.3d at 454 (describing that "while the employer bears the burden of showing that a fought-over job function is essential, . . . the employee bears the burden of showing that she could perform that function, even if only with some reasonable accommodation for her disability.") (internal citations omitted).

This he has not done, even drawing all reasonable inferences in his favor.  To begin, Contini makes no showing that he would have been able to perform the essential functions of his job if he were allowed to work from home one day a week.  He has not described why he did not need to be in the office five days a week after being on leave for several months nor has he demonstrated that he could do his particular job from home.  Instead, he only contends that he should have been allowed to use the Federal Reserve's flexible work policy because some number of other employees used it to work from home once a week.  Doc. No. 37 at 3.  That argument, however, does not help Contini meet his burden that he was able to perform the essential functions of his job with or without reasonable accommodation.[14]

---

[14] For example, Contini did not argue and show that the other employees who worked from home one day a week held similar positions to him or had similar job responsibilities.

That Contini has not met his burden is compounded by the fact that he ended up taking approximately one day off every week, but he never used any of those days to go see his therapist, who he contends he needed to see on a weekly basis for treatment.  Doc. No. 37-1 ¶¶ 185, 194-95.  His therapist was also based in Providence, Rhode Island which is a nearly 240-mile roundtrip commute from Provincetown where he lived.  Id. ¶¶ 191-92.  Contini only preferred in-person meetings with his therapist, but he has not shown how he would both work from home and attend therapy in Providence on the same day, or that the commute to and from Providence would not cause him "stress and anxiety" which he describes he experienced from his similarly long commute from Provincetown to Boston.  Id. ¶ 189.  Neither has Contini alleged that he would have obtained (or did obtain) a different therapist based in Provincetown or Boston, near his home or work, respectively.  Finally, nothing about Contini's relocation to Provincetown appears to arise from his disability.  He states he chose to move from Boston to Provincetown due to financial reasons resulting from his then pending divorce, and he has not shown that he needed to live in Provincetown because of his disability.  Accordingly, the Court concludes that even if Contini requested an accommodation, he has not met his burden to show that the accommodation was reasonable, i.e., that he would have been able to perform the essential functions of his job with or without accommodation.  Thus, the Court ALLOWS the Federal Reserve's Motion for Summary Judgment (Doc. No. 31) on Count II.

B.  Interference with FMLA Rights (Count IV)

In Count IV, Contini claims that after his FMLA leave, the Federal Reserve did not return him to his prior position or a substantially equivalent one.  Doc. No. 1 at 9.  The FMLA provides that "[f]ollowing a qualified absence, the employee is entitled to return to the same position or an alternate position with equivalent pay, benefits, and working conditions, and without loss of

accrued seniority." Hodgens, 144 F.3d at 159 (citing 29 U.S.C. § 2614(a)(1); 29 C.F.R. §

825.100(c)).  An equivalent position is one that is "virtually identical to the employee's former

position in terms of pay, benefits and working conditions, including privileges, perquisites and

status" and involves "the same or substantially similar duties and responsibilities, which must

entail substantially equivalent skill, effort, responsibility, and authority."  29 C.F.R. §

825.215(a).  The equivalency requirement, however, "does not extend to de minimis, intangible,

or unmeasurable aspects of the job."  Id. § 825.215(f).

Contini argues that he was not returned to his former position because the Federal

Reserve (1) subjected him to a "Re-Entry Plan" of non-substantive tasks that also removed him

from his Vice Chair role on a national workgroup known as SEAMS; (2) required him to speak

to his staff in a "light" and "equitable" manner; and (3) removed a business line from under

him.[15]  Doc. No. 37 at 2, 19.  Even drawing all reasonable inferences in Contini's favor, a

reasonable jury could not conclude that Contini was not reinstated to the same or a substantially

equivalent position.  As to the Re-Entry Plan, Contini's counsel understandably agreed in open

court that gradual resumption of one's responsibilities after FMLA leave, especially when the

leave involves a substantial period of time, does not necessarily mean that an employee was not

reinstated to a substantially equivalent position.  Although Contini contests that the Re-Entry

Plan here was in fact a plan to restore him to his former position, no reasonable jury would agree.

The ramp up activities described in the Re-Entry Plan do not support an inference that the

---

[15] The Court addresses the three reasons Contini provides for why he was not returned to his
former position in his Opposition.  Doc. No. 37 at 2, 19.  Court rules limit memoranda to twenty
pages, absent leave of Court.  L.R. 7.1(b)(4).  Insofar as Contini seeks to put before the Court
reasons that were advanced in his Statement of Additional Facts but not set forth in the
Opposition, as he attempts to do by merely citing to several paragraphs from the Statement of
Additional Facts, see Doc. No. 37 at 2, 19, the Court deems that an impermissible attempt to
disregard the rules on page limits.  Any such arguments are waived.

Federal Reserve denied Contini an equivalent position; the document merely describes a phased return as well as certain benchmarks to accomplish along the way.  See Doc. No. 33-1 at 41-44 (Exhibit U).  The same conclusion arises from comparing this document to Contini's formal job description; the Re-Entry Plan does not eliminate responsibilities, nor does it suggest it supersedes his job description.  See id.; Doc. No. 33 at 121-22 (Exhibit E).

Simply put, the Federal Reserve advances a legitimate business justification for the approach outlined in the Re-Entry Plan: Contini was out for approximately seven months, meaningful organizational changes occurred in his absence, and the work environment survey results showed discontent within his unit, including that some employees felt "uncomfortable" speaking up and felt like Contini exhibited "favoritism."  See, e.g., Doc. No. 37-1 ¶¶ 100-02. The same is true of directing Contini to keep it "light and equitable" when speaking to his team in light of the survey results.  See Doc. No. 33-1 at 41-44 (Exhibit U).  Contini has not submitted evidence demonstrating that these actions violated his right under the FMLA to return to his position or one equivalent to it.  See 29 C.F.R. § 825.215(f).

Three more points bear mention.  First, Contini's argument that the Federal Reserve did not reinstate him because it removed a business line from under him is inapposite.  This reorganization occurred in late March and early April 2019, several months after Contini returned from FMLA leave, and Contini has not demonstrated any temporal or other connection with his leave.  See Doc. No. 37-1 ¶ 77.  Second, insofar as Contini furthers a theory of interference with his FMLA rights based on deprivation of future leave, this argument fails as well.  Contini argues that he would have been eligible to use additional FMLA leave intermittently beginning in late summer or early fall of 2019, and that "it is reasonable to infer that the actors involved were aware" about this and therefore terminated him to avoid future

leave.  Doc. No. 37 at 19.  Other than this conclusory assertion, Contini provides no evidence from which a reasonable jury could draw the inference that the Federal Reserve was on notice about his upcoming eligibility for additional leave or that the termination is in any way causally related to such notice if it even existed.

Third and finally, Contini argues that the Federal Reserve delayed his return to work to January 3, 2019 even though Contini's therapist Medeiros informed Nurse Knight as early as October 31, 2018 that he believed Contini was ready to return to work.  Id. at 2; Doc. No. 37-11 ¶¶ 6-11.  On that day, Knight responded by requiring him to review Contini's job description before verifying that he could perform his role's tasks, and Medeiros received the job description that same day.  Doc. No. 37-11 ¶¶ 9-12.  The Federal Reserve's FMLA policy expressly provides that it may require medical certification that an employee can perform the essential functions of their job and may also require the health care provider to review the job description prior to certification.  Doc. No. 33 at 197-98 (Exhibit O).  Although Contini argues that Knight only asked for such a certification after Wozek instructed her too, he has not shown that this requirement is not in line with Federal Reserve policy or that it was not applied to other employees who took FMLA leave.[16]  Cf. Bellone v. Southwick-Tolland Reg'l Sch. Dist., 748 F.3d 418, 425 (1st Cir. 2014).  Contini's therapist did not provide the medical certification until December 14, 2018 when he verified that he reviewed Contini's job description and believed that

---

[16] Contini also argues that the Federal Reserve's FMLA approval form for him did not require that the certification address his ability to perform essential functions.  Doc. No. 37-13 at 30.  The fact that the Federal Reserve later decided to require Contini's therapist to review the job description and address the essential functions question does not change this conclusion.  Nurse Knight informed Contini's therapist of the added requirement on October 31, 2018, weeks after Contini's sixteen-week FMLA leave had expired.  Doc. No. 37-11 ¶¶ 7-12.  Given the changed circumstances of a longer-than-anticipated leave, Contini has not shown why the Federal Reserve was not allowed to thereafter make such a requirement pursuant to their policy or that they did not ask for such certification from similarly situated employees.

Contini was "ready and able to meet all components, requirements and expectations of this complex and multi-tiered position." Doc. No. 37-1 ¶ 34.[17] Only at that point were the requirements for return under Federal Reserve policy satisfied. These undisputed facts lead the Court to conclude that the Federal Reserve did not interfere with Contini's FMLA rights. Accordingly, the Court ALLOWS the Federal Reserve's Motion for Summary Judgment (Doc. No. 31) as to Count IV.

      C.  <u>Retaliation under the ADA and FMLA (Counts III and V)</u>[18]

To prove retaliation, Contini must show the basic elements that 1) he engaged in protected conduct; 2) he suffered an adverse employment action; and 3) the adverse employment action was causally linked to the protected conduct. <u>Freadman</u>, 484 F.3d at 106; <u>Hillstrom v. Best W. TLC Hotel</u>, 265 F. Supp. 2d 117, 127 (D. Mass. 2003), <u>aff'd</u>, 354 F.3d 27 (1st Cir. 2003). Similar to the discrimination claim, the burden-shifting framework applies to the

---

[17] Even assuming without deciding that the Federal Reserve prevented Contini from returning before January 2019, his therapist did not provide the certification until December 14, 2018, and so the Court does not consider allegations that Contini wanted to return prior to that date. Although Contini further disagrees that he and Nurse Knight agreed to January 3, 2019 as the return date, Doc. No. 37-1 ¶ 31, there is no record of either Contini or Medeiros thereafter disputing in writing the "agreement" Knight stated in her November 30, 2018 email as to the return date nor any under oath testimony from either one of them stating one or both of them disputed, at that time (<u>i.e.</u>, between November 30, 2018 and January 3, 2019), the agreement orally (or then requested an earlier start date). <u>See, e.g.</u>, Doc. No. 37-8 at 182:5-18 (describing that Knight informed Medeiros the return to work date would be January 3, 2019 and that Medeiros had no response to her statement); Doc. No. 33-1 at 34 (Exhibit S) (showing an email from Wozek to Contini on December 17, 2018 stating that he (Wozek) heard Contini will be returning on January 3rd, 2019, and Contini's reply includes no objections to such a return date).
[18] Neither party has argued that the standard for evaluating retaliation claims under the ADA and FMLA differ. The Court agrees, finding that any differences between the two claims are not meaningful enough to warrant separate analyses. The Court simply notes that under a FMLA retaliation claim, the third element can be met through causation or because the individual "was treated less favorably than an employee who had not requested leave under the FMLA." <u>Furtado v. Standard Parking Corp.</u>, 820 F. Supp. 2d 261, 280 (D. Mass. 2011). The Court considers this in the mix.

retaliation claims once the plaintiff has met their burden of proving the prima facie case.  See

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Kelley v. Corr. Med. Servs., Inc., 707

F.3d 108, 115 (1st Cir. 2013); Hodgens, 144 F.3d at 160.  The Federal Reserve does not dispute

the first element here, Doc. No. 44 at 18, and instead directs its summary judgment arguments at

the remaining two elements—adverse employment action and causation, as well as the pretext

analysis.

    As to the second element, a materially adverse action typically involves "discrete changes

in the terms of employment, such as 'hiring, firing, failing to promote, reassignment with

significantly different responsibilities, or a decision causing significant change in benefits.'"

Morales-Vallellanes v. Potter, 605 F.3d 27, 35 (1st Cir. 2010) (quoting Burlington Indus., Inc. v.

Ellerth, 524 U.S. 742, 761 (1998)).  The action must "be more disruptive than a mere

inconvenience or an alteration of job responsibilities."  Marrero v. Goya of Puerto Rico, Inc., 304

F.3d 7, 23 (1st Cir. 2002).  "[R]eassignment with significantly different responsibilities may be

actionable."  Burns v. Johnson, 829 F.3d 1, 10 (1st Cir. 2016) (internal quotation marks omitted).

This analysis often "depends on a constellation of surrounding circumstances," and a contextual

analysis is therefore necessary.  Burlington N. v. White, 548 U.S. 53, 69 (2006) (describing that

"[a] schedule change in an employee's work schedule may make little difference to many

workers, but may matter enormously to a young mother with school-age children.").  Put another

way, "a plaintiff must show that a reasonable employee would have found the challenged action

materially adverse."  Cherkaoui v. City of Quincy, 877 F.3d 14, 52 (1st Cir. 2017).  Importantly,

"conduct need not relate to the terms and conditions of employment to give rise to a retaliation

claim." Billings v. Town of Grafton, 515 F.3d 39, 54 (1st Cir. 2008) (citing Burlington N., 548 U.S. at 70).[19]

Contini discusses several actions in the Complaint that he considers adverse, only to focus on his termination in the scope of the retaliation claims in his Opposition. See generally Doc. Nos. 1, 37. It is undisputed that Contini was terminated, and that termination is an adverse action. See Surprise v. Innovation Grp., Inc., 925 F. Supp. 2d 134, 146 (D. Mass. 2013). Out of an abundance of caution, however, the Court briefly considers the other possible adverse actions discussed in the Complaint such as (1) lowering his salary, (2) relocating him to a private office, (3) removing a business line from under him and giving him a new title, and (4) denying him use of the flexible work policy. See, e.g., Doc. No. 1 ¶ 12. All of these actions fail to meet the threshold of a materially adverse employment action or pretext. As to salary, it is undisputed that the Federal Reserve increased Contini's salary when he returned to work from FMLA leave and made him a partial payment of his 2018 incentive bonus in line with its policy. Doc. No. 37-1 ¶¶ 45, 49-51. As to his office, it is undisputed that the Federal Reserve relocated Contini from a shared office to a private office, with his consent. Id. ¶¶ 55-56; Doc. No. 32 at 14-15. Even if the private office was smaller or not close to his team, that does not rise to a materially adverse employment action. Marrero, 304 F.3d at 23; Lavalley v. Quebecor World Book Servs. LLC., 315 F. Supp. 2d 136, 147 (D. Mass. 2004) (describing that "relegation to a task in an isolated work space" and "isolation (physical and social) from co-workers" are unlikely to rise to the level of an adverse action). Nor does his allegation that he was unaware he was giving up his

---

[19] The First Circuit has "interpreted the retaliation provision of the Americans with Disabilities Act (ADA) interchangeably with those specifically addressing Title VII" because of the "relatedness of the two statutes." Vera v. McHugh, 622 F.3d 17, 32 n.18 (1st Cir. 2010) (citing Carreras v. Sajo, Garcia & Partners, 596 F.3d 25, 36 n.10 (1st Cir. 2010)).

secondary space used to meet with staff meet this threshold.  The record does not show that (1) he thereafter had no conference room space to meet with his staff or (2) was not able to reasonably access those spaces.

The same goes for his new title and the removal of a business line from under him. Contini's title changed from "Manager, Statistics" to "Business Manager 2," but this was the result of restructuring that began prior to his leave and implemented in October 2018 when Contini was on leave.  See, e.g., Doc. No. 32 at 5.  This change also affected the titles of several other employees including managers.  Doc. No. 37-1 ¶ 59.  Additionally, the removal of a business line from under him occurred as a part of organizational restructuring.  See, e.g., Doc. No. 32 at 8.  Specifically, the Federal Reserve relocated the business line months after he returned because key members of that team retired, and this restructuring affected other individuals beyond Contini as well such as his direct report Stephen Papazian.  Id.  These facts demonstrate that these actions are not materially adverse employment actions.  Gu v. Bos. Police Dep't, 312 F.3d 6, 14 (1st Cir. 2002) ("When a general reorganization results in some reduction in job responsibilities without an accompanying decrease in salary, or grade, those changes cannot be dubbed adverse employment actions." (internal citations omitted)).  Finally, the Court considers the alleged adverse action of denying Contini use of the flexible work policy to work from home once a week.  Even if this action qualified as a materially adverse action, the Court has already discussed infra that no reasonable jury would find that the Federal Reserve's business needs which required Contini to be in the office five days a week after a seven-month leave is pretextual for unlawful discrimination or retaliation.

That leaves the termination as the only alleged adverse action.  As to the FMLA retaliation claim, the Court concludes that even drawing all reasonable inferences in Contini's

22

favor, no reasonable jury could conclude that his termination was causally connected to his

FMLA leave seven months prior.[20]   Thus, the Court ALLOWS the Federal Reserve's Motion for

Summary Judgment (Doc. No. 31) as to Count IV.  As to the ADA retaliation claim, however, a

reasonable jury could conclude that Contini's complaints of being treated unfairly and requesting

an attorney one day before the Federal Reserve decided to terminate him demonstrates

causation.[21]   Moreover, because the Court has already discussed within its analysis of Count I

that a reasonable jury could conclude that the alleged performance issues contributing to the

termination were pretexts for unlawful discrimination based on his disability, the Court comes to

the same conclusion regarding the ADA retaliation claim.  The same point the Court made

regarding contrary evidence applies here as well.  Accordingly, the Court DENIES the Federal

Reserve's Motion for Summary Judgment (Doc. No. 31) as to Count III.

---

[20] Although for FMLA retaliation claims the third element can be shown through an employee being treated less favorably than an employee who had not requested leave under the FMLA, the first element requires that the employee have availed himself of a protected right under the FMLA.  Furtado, 820 F. Supp. 2d at 280.  Given that termination is the only remaining adverse action, the only plausible protected activity for this action is Contini's statements of wanting to speak to an attorney which are not palpably related to his FMLA leave.  In other words, the lack of temporal proximity from his FMLA leave seven months earlier also defeats the first element in this analysis.

[21] Although there remains some dispute about when exactly Contini asked to speak to an attorney, it is undisputed that there was discussion of being "treated unfairly" and "tak[ing] to court" during a July 30, 2019 meeting with Gendron, Savage, and Wozek because Contini had been asked to take a drug test.  See, e.g., Doc. No. 37-14 at 68-69.  Contini has also consistently stated that he made some kind of request to speak with an attorney.  See, e.g., Doc. No. 33 at 171-72 (Exhibit L); Doc. No. 37 at 6; Doc. No. 37-1 ¶¶ 206, 222; Doc. No. 37-2 ¶¶ 126-27.  This evidence shows sufficient protected activity to withstand summary judgment under the Plaintiff-friendly standard applicable to the pending motion.  The Federal Reserve then decided to terminate Contini the day after on July 31, 2019.  Doc. No. 37-1 ¶ 214.  The next day on August 1, 2019, Contini reiterated via email that he wanted to speak with an attorney before discussing next steps.  Doc. No. 33-5 at 3 (Exhibit LLL).  At the very least there is a genuine dispute of material fact regarding whether Contini stated his intentions to speak to an attorney before the termination decision, and for purposes of summary judgment, the Court views the disputed facts in Contini's favor.

IV.     <u>CONCLUSION</u>

For the foregoing reasons, the Court ALLOWS IN PART and DENIES IN PART the

Federal Reserve's Motion for Summary Judgment (Doc. No. 31).  Only the disability

discrimination (Count I) and ADA retaliation (Count III) claims remain in this case moving

forward.  Trial will commence on January 9, 2023 at 9:00 a.m.  The parties shall file a joint

status report within fourteen days stating whether all parties do or do not consent to the exercise

of jurisdiction by the assigned magistrate judge (here, Judge Boal) over the trial without

revealing the position of an individual party.  In the event of consent, the Court will reassign the

matter to Judge Boal who would then determine the trial date.


SO ORDERED.

 /s/ Leo T. Sorokin
United States District Judge